IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


SYM-AGRO, INC.,                                     No. 3:21-cv-00429-HZ

           Plaintiff,                          OPINION & ORDER

    v.

SEIPASA, S.A.,

           Defendant.


Elizabeth C. Knight
Timothy J. Bernasek
Chelsea J. Glynn
Dunn Carney LLP
851 SW Sixth Avenue
Suite 1500
Portland, OR 97204-1357

    Attorneys for Plaintiff

1 – OPINION & ORDER

Kenneth R. Davis, II
Kristen Price
Mohammed Workicho
Lane Powell, PC
601 SW Second Avenue
Suite 2100
Portland, OR 97204-3158

    Attorneys for Defendant

HERNÁNDEZ, Chief Judge

This matter comes before the Court on a Motion for Preliminary Injunction filed by Sym-Agro, INC. *See* Pl's Supp. Brief, ECF No. 29. An evidentiary hearing was held on April 22, 2021 and April 23, 2021, at which the Court heard testimony and argument by the parties. ECF Nos. 41, 42. For the reasons below, Plaintiff's Motion is GRANTED.

## BACKGROUND

### I. Factual Background

Plaintiff Sym-Agro, Inc. is a distributor of agricultural products. Compl. ¶ 1, ECF 1. Defendant Seipasa, S.A. is a Spanish manufacturer of fertilizers, plant biostimulants, biopesticides, and pesticides. *Id.* ¶ 2. Defendant's products are sold and distributed by Plaintiff in the United States. Bierma Decl. ¶ 2, ECF 3.

### A.     The Parties' Relationship and 2019 Agreement

In 2012, Plaintiff and Defendant began their business relationship. Espinosa Decl. Ex. 20., ECF 34-1. At the time a "priority product" for Plaintiff was Defendant's product Amicos Sec, a Cinnamic aldehyde. *Id.* Eventually, Plaintiff suggested changing the name of the product from Amicos Sec to Cinnerate. Second Supp. Bernasek Decl. Ex. 10, ECF 31-10. Cinnerate is based on cinnamon oil, the active ingredient in Cinnerate is cinnamaldehyde. Hr'g Tr. 21:18–21.

Cinnerate was developed as a 25b product. Espinosa Decl. ¶ 8, ECF 34. 25b products are exempt from the Environmental Protection Agency's (EPA) typical registration requirements because they use safer food grade ingredients. To be a 25b exempt product, the listed name of the active ingredient must conform to the EPA's specific list of exempted active ingredients.

Prior to the parties' relationship, Defendant developed an insecticide and fungicide called Seican. Espinosa Decl. ¶ 3. Seican contains cinnamaldehyde. *Id.* ¶ 4. Early correspondence between the parties suggests that at the time, the parties referred to the product that was also known as Amicos Sec, and eventually Cinnerate, as Seican. Second Supp. Bernasek Decl. Ex. 8. In 2017, Defendant applied for EPA approval of Seican. Bierma Decl. Ex. 2, ECF 3

On March 6, 2018, the parties signed a distribution agreement (2018 Agreement) through which Plaintiff acted as the exclusive distributor of "Cinnerate / 25b Exempt fungicide, miticide" and certain other Defendant products within a defined territory and a non-exclusive distributer of other Defendant products within the territory with rights of supply. Pl.'s Ex. 5, ECF 37.[1] The agreement was effective as of February 1, 2018. *Id.*

By May 6, 2018, Plaintiff learned of Defendant's intention to launch Seican in the U.S. market. Second Supp. Bernasek Decl., Ex. 16. Defendant received EPA approval of Seican on August 10, 2018. Bierma Decl. Ex. 2

In June 2019, Defendant and Plaintiff entered into a new distribution agreement (2019 Agreement) through which Plaintiff would be the exclusive distributor of certain products manufactured by Defendant within specified territories and the non-exclusive distributor of other products with a right of supply. Pl.'s Ex. 13. This included granting Plaintiff the exclusive right

---

[1] Unless otherwise specified, "Ex." references exhibits admitted at the Preliminary Injunction hearing.

to sell Cinnerate in Arizona, California, Florida, Georgia, Idaho, Montana, Nevada, Oregon, Utah, Washington, Wyoming, and Hawaii ("Exclusivity Clause"). *Id.* This exclusive right covered "all modifications, new versions, or replacements" ("Products Clause") of Cinnerate. *Id.* The parties also included language that was not in the 2018 Agreement. *Id.* Under the language, Plaintiff had equal rights to 25b products and products that obtained EPA approval. *Id.* The Agreement was set to last for a term of three years, with options to renew and a termination clause. *Id.*

The Products Clause provides:

> **Product(s)** are those described in Exhibit 1 together **with** all modifications, new versions or replacements therefor, as well as product developments as described at Section 4 and such other products as the parties may agree from time to time in writing to include within the definition of "Product(s)
> **In the case where any of the Product(s) described in Exhibit 1 becomes an EPA registered product, Distributor shall have first right of refusal to market and sell** such **registered product in the Exclusive Territory. Should Distributor decide not to exercise the right to market the registered product, Manufacturer agrees not to market or sell the registered product in Distributor's Exclusive Territory, either directly or indirectly, provided Distributor is in compliance with the "Minimum Purchase Amounts" as outlined in Exhibit 1and in compliance with Section 15.2 (a).**

*Id.*

The Termination Clause provides:

> 15.2 SEIPASA shall be entitled to terminate this Agreement forthwith by notice in writing: (a) A the end of any Contract Year after the second year in which the Minimum Purchase Amount for the Contract Year outlined in Exhibit 1, Section E.1.3 is not met.

*Id.*

Section 1.3, The Minimum Purchase Amount for Contract Year Clause provides:

E1.3 **Minimum Purchase Amount in US Dollars per Contract Year**

| Minimum purchase amount | season |
|---|---|
| $ 1.200.000,00 | 18-19 |
| $ 1.600.000,00 | 19-20 |
| $ 2.000.000,00 | 20-21 |

Contract Year: November 1st through October 31st

*Id.*

Just weeks before Plaintiff signed the 2019 Agreement, Defendant publicly announced an agreement with Summit Agro, Plaintiff's competitor, for Summit Agro to sell Seican throughout the United States. Def.'s Ex. 518. Once Plaintiff learned of this partnership, it raised concerns that Cinnerate and Seian were being positioned in the market as the same product. Talavara Decl. Ex. 7, 8. From April 2019 to February 2021 Defendant sold Summit Agro 3,600 gallons of Seican. Talavera Decl. ¶10.

### B. 2018-2019 Contract Year Minimum Purchase Amount Dispute

To avoid early termination, the 2019 Agreement requires Plaintiff to not miss the Minimum Purchase Amount for more than one Contract Year. Pl.'s Ex. 13. The Contract Year runs November 1 through October 31. *Id.* Plaintiff placed Purchase Order 1306 in March 2018. Bierma Decl. ¶ 13. However, it did not invoice and pay for Purchase Order 1306 until December 2018 because the purchase order was for "safety stock"—stock Plaintiff used as backup when

5 – OPINION & ORDER

customers needed it. *Id.* Given this practicality, Plaintiff understood Purchase Order 1306 to count towards the 2018-2019 Contract Year. *Id.*

On October 14, 2019, Steve Bratcher, Plaintiff's Chief Financial Officer, sent José Talvera, Defendant's Chief Commercial Officer, an email confirming this understanding. Talavera Decl. Ex. 15 at 2–3. Mr. Talavera sent the following response dated October 29, 2019:

> You're right and you made the real purchase at the end of the last year (as Peter said, in December'18), but for us, from an invoicing point of view, the PO was placed in March'18, that's why I had my figures with other interpretation ... anyway, if we consider this, with a new PO, you will be above the $1.2 MM. Ok, agree…

*Id.*

On October 30, Plaintiff placed a final purchase order to meet its minimum purchase order requirement for the 2018-2019 Contract Year. Bierma Decl. ¶ 17.

### C. Termination of the 2019 Agreement

On January 21, 2021, Plaintiff placed six purchase orders with Defendant. Bierma Decl. Ex. 6. The next day, Mr. Talavera confirmed receipt of the purchase orders by email, replying "Thank you very much!!!" Bierma Decl. Ex. 7.

On February 1, 2021, Defendant sent Plaintiff a letter purporting to terminate the 2019 Agreement. Talavera Decl. Ex. 16. Defendant premised the early termination on Plaintiff's alleged failure to fulfill the minimum purchase amount for two years in a row. *Id.*

## II. Procedural Background

On February 19, 2021, Plaintiff filed suit against Defendant in Clackamas County Circuit Court, bringing claims for breach of contract, breach of the duty of good faith and fair dealing, and for declaratory and injunctive relief. Notice of Removal, Ex. 1, ECF 1-2. On February 26,

2021, Plaintiff filed a motion for a temporary restraining order, which the state court granted on March 2, 2021. *Id.*

Under the state court injunction, Defendant was (1) enjoined from terminating the Agreement; (2) ordered to immediately fill Plaintiff's pending purchase orders as well as any future purchase orders consistent with the terms of the Agreement and the parties' past course of dealing; and (3) enjoined from selling Seican to Plaintiff's competitors within the exclusive territory as defined by the Agreement. Plaintiff contends Defendant did not comply with the requirements of the state court injunction.

On March 22, 2021, Defendant removed the case to federal court. ECF 1. On March 23, 2021, Plaintiff filed a motion for a temporary restraining order (TRO), asking that the Court extend the previously issued injunction. ECF 4. The Court held that the state court injunction had expired and construed Plaintiff's motion as a motion for a new TRO. ECF 16.

The Court then granted Plaintiff's motion for a TRO in part concluding that Plaintiff had made a sufficient showing of a likelihood of success on the merits on its claim for breach of contract and that Plaintiff's showing on the facts and law were sufficiently clear to justify the issuance of a mandatory injunction directing Defendant to fill Plaintiff's purchase orders. ECF 17. The Court declined to enjoin Defendant from selling Seican to Plaintiff's competitor but allowed Plaintiff to renew its request for relief. *Id.*

On April 19, 2021 Plaintiff filed its Motion for a Preliminary Injunction and Defendant responded. ECF 29, 32. The Court held an evidentiary hearing on April 22 and April 23, 2021, at which it took testimony from witnesses, received exhibits into evidence, and heard argument from the parties. ECF 41, 42.

//

**STANDARDS**

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show (1) that he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his or her favor; and (4) an injunction is in the public interest. *Id.* at 20.

In the Ninth Circuit, courts may apply an alternative "serious questions" test, which allows for a preliminary injunction where a plaintiff shows that "serious questions going to the merits" were raised and the balance of hardships tips sharply in plaintiff's favor, assuming the other two elements of the *Winter* test are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). This formulation applies a sliding scale approach where a stronger showing of one element may offset a weaker showing in another element. *Id.* at 1131. Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four elements set forth above. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

Finally, the already high standard for granting a TRO or preliminary injunction is further heightened when the type of injunction is a "mandatory injunction." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). A mandatory injunction goes beyond maintaining the status quo and "orders a responsible party to take action." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (internal quotation marks and citation omitted). To determine whether a requested injunction is mandatory, the status quo means "the last, uncontested status which preceded the pending controversy." *Id.* To obtain a mandatory injunction,

a plaintiff must establish "that the law and facts clearly favor her position, not simply that she is likely to succeed." *Garcia*, 786 F.3d at 740 (emphasis in original).

## DISCUSSION

Plaintiff brings claims for (1) breach of contract against Defendant, alleging wrongful termination, violation of its contractual obligation to fulfill Plaintiff's purchase orders, and violation of the 2019 Agreement's exclusivity clause; (2) and breach of duty of good faith and fair dealing. Plaintiff also asks the Court to order Defendant to pay air freight and increased costs it incurred since the issuance of the TRO.[2]

For the reasons discussed below, the Court finds that Plaintiff has established a likelihood of success on the merits and a likelihood of irreparable harm. The balance of equities tips in favor of Plaintiff and the public interest does not strongly favor either side.

### I. Likelihood of Success on the Merits

To prevail on a motion for preliminary injunction, a plaintiff must show either a likelihood of eventual success on the merits or, under the Ninth Circuit's alternative "sliding scale" formulation of the test, serious questions going to the merits of their claims. *Winter*, 555 U.S. at 20; *Alliance for the Wild Rockies*, 632 F.3d at 1131–32. However, a court's decision on a motion for preliminary injunction is not a ruling on the merits of the claim. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

---

[2] At the hearing on Plaintiff's Motion for a Preliminary Injunction the Court ruled that it would not consider arguments related to the financial hardship Plaintiff alleges it incurred after entry of this Court's TRO. To the extent they become a relevant consideration, Plaintiff may raise these allegations and damages through the regular course of litigation.

9 – OPINION & ORDER

Plaintiff brings claims for breach of contract against Defendant alleging wrongful termination of the 2019 Agreement, violation of its contractual obligation to fulfill Plaintiff's purchase orders, and violation of the 2019 Agreement's exclusivity clause.

"To establish a breach of contract claim under Oregon law, a plaintiff must show: (1) the existence of a contract; (2) its relevant terms; (3) the plaintiff's full performance and lack of breach; and (4) the defendant's breach resulting in damage to the plaintiff." *Gunderson LLC v. BCG Props. Grp., Inc.*, Case No. 3:19-cv-01569-AC, 2020 WL 1529356, at *5 (D. Or. Mar. 30, 2020) (internal quotation marks and citation omitted).

### A. Breach of Contract Claim - Termination Clause

Defendant terminated the 2019 Agreement based on Plaintiff's alleged failure to meet the Minimum Purchase Amount for two consecutive Contract Years. The 2019 Agreement provides for a three-year term and allows for early termination only where Plaintiff fails to meet the Minimum Purchase Amount for two Contract Years in a row.

Plaintiff has produced evidence that it met the Minimum Purchase Amount for the 2018-2019 Contract Year or at least reasonably relied on Defendant's representations that it had. In an email before the end of the relevant Contract Year, Defendant's Chief Commercial Officer, Mr. Talavera, expressly affirmed Plaintiff's understanding that Purchase Order 1306 would count towards the Minimum Purchase Amount for Contract Year 2018-2019. Plaintiff reasonably relied on this affirmance and adjusted its end of year purchases accordingly.

Defendant argues Mr. Talavera's email does not constitute a valid waiver of Defendant's right to terminate the 2019 Agreement based on Plaintiff's failure to meet the Minimum Purchase Amount.

"Waiver is the voluntary relinquishment of a known right." *Bennett v. Farmers Ins. Co. of Oregon*, 332 Or. 138, 156 (2001). "Under general contract law, a party to a written contract can waive a provision of that contract by conduct or by oral representation, despite the existence of a nonwaiver clause." *Moore v. Mut. of Enumclaw Ins. Co.*, 317 Or. 235, 241 (1993). The waiver of a contract term must be "unequivocal." *Bennett*, 332 Or. at 157.

Defendant argues Mr. Talavera's statement was not unequivocal. The plain language of the email suggests otherwise. In the email, Mr. Talavera acknowledges that counting Purchase Order 1306, and Plaintiff's final order would put Plaintiff above the minimum amout for Contract Year 2018-2019 and then wrote, "Ok, agree." This statement suggests Defendant agreed to Plaintiff's understanding of the Minimum Amount for that year. Additionally, Plaintiff does not need to show that this email constituted a wavier of Defendant's rights under the Agreement, only that Plaintiff fulfilled its obligation under the Agreement to meet the Minimum Purchase Amount which foreclosed Defendant from terminating the Agreement on that basis.

The Court finds that Plaintiff did not fail to meet the Minimum Purchase Amount under the Agreement for two consecutive Contract Years and that Defendant wrongfully terminated the Agreement. Final resolution of Plaintiff's claims must await further litigation, but the Court finds that Plaintiff has carried its burden of proof and persuasion for purposes of a preliminary injunction on its breach of contract claim related to Defendant's termination of the 2019 Agreement.

**B.      Breach of Contract Claim - Failure to Fill Plaintiff's 2021 Purchase Orders**

Plaintiff provided evidence that Defendant failed to fulfill its January and February 2021 purchase orders in violation of the parties' 2019 Agreement. Pl.'s Ex. 25, 30; Bierma Decl. ¶ 24.

Defendant did not offer evidence to the contrary or address this contention at the hearing. Rather, Defendant appears to rely on its position that it lawfully terminated the Agreement and was thus absolved of its obligation to fulfill Plaintiff's 2021 purchase orders. As discussed above, the Court finds that Defendant's attempted early termination breached the parties' Agreement. Defendant, therefore, had a continuing obligation to fulfill Plaintiff's 2021 purchase orders under Section 10.1 of the 2019 Agreement. Thus, the Court finds Plaintiff has established that the law and facts clearly favor its position that Defendant breached the parties' Agreement by not fulfilling its 2021 purchase orders.

**C.      Breach of Contract Claim - Exclusivity Clause**

Plaintiff alleges Defendant breached the Agreement's Exclusivity Clause by appointing Summit Agro to sell Seican in Plaintiff's exclusive territory.

The Exclusivity Clause covers the named product, Cinnerate, and "all modifications, new versions or replacements." Pl.'s Ex. 13. Plaintiff argues Seican is a replacement product for Cinnerate and thus covered under the Exclusivity Clause. Defendant argues Seican cannot be a replacement product under the Agreement because it was developed before Cinnerate.

Contract construction is a question of law for the court. *Hoffman Const. Co. of Alaska v. Fred S. James & Co. of Or.*, 313 Or. 464, 469 (1992). The goal of contract construction is to ascertain the parties' intent. *Totten v. N.Y. Life Ins. Co.*, 298 Or. 765, 770 (1985).

Oregon courts follow a three-step inquiry in interpreting the provisions of a contract. *Yogman v. Parrott*, 325 Or. 358, 361(1997). The first step is to examine the text of the disputed provision, in the context of the document as a whole. *Id.* If the disputed provision is clear, the inquiry ends. *Id.*

> When considering a written contractual provision, the court's first inquiry is what the words of the contract say .... To determine that, the court looks at the four

> corners of a written contract, and considers the contract as a whole with emphasis on the provision or provisions in question. The meaning of disputed text in that context is then determined. In making that determination, the court inquires whether the provision at issue is ambiguous. Whether terms of a contract are ambiguous is a question of law. In the absence of an ambiguity, the court construes the words of a contract as a matter of law.

*Id.* (internal quotation marks omitted) (ellipsis in *Yogman*).

A "contractual provision is ambiguous if its wording can, in context, reasonably be given more than one plausible interpretation." *Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 379 (2011); *see also Hoffman Constr.*, 313 Or. at 470 (for a term to be ambiguous, there must be more than a showing of two plausible interpretations; a term is ambiguous only if two or more plausible interpretations of that term withstand scrutiny, i.e., continue to be reasonable, after the interpretations are examined in the light of, among other things, the particular context in which that term is used in the contract and the broader context of the contract as a whole).

If the contractual provision is ambiguous, the court generally proceeds to the second step of the interpretation analysis: examining extrinsic evidence of the parties' intent. *Yogman*, 325 Or. at 363. The court is to pursue the parties' intent if possible. *Id.* at 364 (citing O.R.S. 42.240). If, after considering the relevant extrinsic evidence, the court has not resolved the ambiguity, the court proceeds to the third step of the analysis in which the court relies on appropriate maxims of construction. *Id.*

The Court concludes that the Products Clause is ambiguous. In the context of the parties' 2019 Agreement and past dealings, "replacement" could plausibly be interpreted to only apply to products developed after Cinnerate or it could be interpreted to apply to products that were already developed and in the market.

Given this ambiguity, the Court considers extrinsic evidence of the parties' intent and examines whether the parties intended the 2019 Agreement's Exclusivity Clause and Products Clause to apply to Seican.

Plaintiff offers the following evidence that Seican is a replacement of Cinnerate. Plaintiff's President, Peter Bierma, testified that Cinnerate and Seican are both a cinnamaldehyde-based miticide and insecticide and that they are "effectively the same product and serve the same purpose." Bierma Decl. ¶ 7; Hr'g Tr. 25:1-4.. He also stated that in early negotiations the parties referred to what later became Cinnerate as Secian. Second Supp. Bernasek Decl. Ex. 8. Plaintiff presented evidence that Defendant has used Seican and Cinnerate data interchangeably at public presentations and provided the same information to its U.S. Business Development Manager when he asked for "any and all existing Seican or other brands of Seican literature." Second Supp. Bernasek Decl. Ex. 11, 12. Finally, Plaintiff submitted Summit Agro's business plan that clearly shows Summit Agro intends for Seican to replace Cinnerate in the coming years. Second Supp. Bernasek Decl. Ex. 13.

Defendant presents evidence that had the parties intended the provision to cover Seican, Seican would have been listed as a named product in the 2019 Agreement.

Plaintiff's President testified that there was "bad blood" between the parties related to the negotiation of the 2018 Agreement. Hr'g Tr. 30:17-18. During the negotiations, Defendant inserted a clause excluding EPA registered products from the Agreement. After signing the Agreement, Plaintiff's COO testified that they felt "blind-sided" when they learned that Defendant had gotten an EPA registration for Seican and thus Defendant would not have to give Plaintiff exclusive rights to that version of the product. From then on, Plaintiff knew that Defendant planned to launch Seican in U.S. markets. Second Supp. Bernasek Decl. Ex. 16 at 2.

Defendant shows that despite this history, the parties negotiations preceding the 2019 Agreement focused on ensuring full exclusivity for the product Alluma, not Seican. In one email Plaintiff writes, "[w]e simply will not put ourselves in the same situation that has occurred with both Prevont and Cinnerate." Talavera Decl. Ex. 4 at 8. Plaintiff testified that this was because it was concerned that if Alluma became an EPA registered product it would lose the exclusive right to distribute that product, as it did for Seican under the 2018 Agreement.

Plaintiff's President testified that it did not specifically reference Seican in the 2019 Agreement because it was a replacement product for Cinnerate, so was already covered by the Agreement.

Plaintiff and Defendant offer competing stories and evidence regarding whether the parties intended the Exclusivity Clause and Products clause to apply to Seican and whether Seican should be considered a replacement of Cinnerate under the Agreement. Plaintiff bears the burden of proof and persuasion on this claim. With the current record, it has not demonstrated a likelihood of success on the merits that Defendant breached the Agreement's Exclusivity Clause by appointing Summit Agro to sell Seican in Plaintiff's exclusive territory. This is not a decision on the merits though, and whether Plaintiff's claim will ultimately be proved to the trier of fact remains to be seen.

### D.     Duty of Good Faith and Fair Dealing Claim

Plaintiff brings a final claim for breach of the duty of good faith and fair dealing.

Oregon recognizes an implied contractual duty of good faith and fair dealing. *Best v. U.S. Nat'l Bank. of Or.*, 303 Or. 557, 561. The contractual good faith doctrine is designed to "effectuate the reasonable contractual expectations of the parties." *Id.* at 563. "[S]o long as it is not inconsistent with the express terms of a contract, the duty of good faith and fair dealing is a

contractual term that is implied by law into every contract." *Eggiman v. Mid-Century Ins. Co.*, 134 Or. App. 381, 386 (internal quotation marks omitted). The duty "does not operate in a vacuum[;]" rather it "focuses on the agreed common purpose and the justified expectations of the parties, both of which are intimately related to the parties' manifestation of their purposes and expectations in the express provisions of the contract." *Or. Univ. Sys. v. Or. Pub. Emp. Union, Loc. 503*, 185 Or. App. 506, 515–16 (2002) (internal quotation marks omitted). Because the duty cannot contradict an express contractual term, it "may be implied as to a disputed issue only if the parties have not agreed to an express term that governs that issue." *Arnett v. Bank of Am., N.A.*, 874 F. Supp. 2d 1021, 1033 (D. Or. 2012) (quoting *Or. Univ. Sys.*, 185 Or. App. at 511).

Plaintiff alleges six bases for its breach of the duty of good faith and fair dealing claim. Four of the six bases are governed by an express term of the parties 2019 Agreement and therefore cannot be the subject of a good faith and fair dealing claim. The two remaining bases do not appear to be governed by an express term of the contract. They are that Defendant (1) negotiated the Agreement with Plaintiff without disclosing separate negotiations with a competitor and (2) colluded with a competitor to squeeze Plaintiff out of the market after the entry of the circuit court's TRO.

Plaintiff does not provide the context necessary for the Court to evaluate these claims. It does not explain or establish the objectively reasonable contractual expectations between the parties that were outside the express terms of the contract and how this alleged conduct violated those expectations. Additionally, as to the second basis, whether Defendant's conduct amounted to bad faith turns in part on whether the Exclusivity Clause applied to Seican, which remains disputed. Plaintiff has presented compelling evidence of potential bad faith on the part of Defendant and may well prevail on this claim at trial. Plaintiff's briefing and testimony focused

on the breach of contract claims and as a result this claim appears underdeveloped. Plaintiff has not met its burdens of proof and persuasion on this claim.

## II.     Irreparable Harm

"[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (citing *L.A. Memorial Colliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)). However, harm to a company's goodwill, reputation, loss of client relationships, and financial damage can constitute "irreparable harm." *See Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841 ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.")

In the absence of a preliminary injunction, Plaintiff will likely suffer irreparable harm in the form of loss of client relationships and good will. Plaintiff testified that it lost a major customer when it was unable to timely fill its orders due to Defendant's wrongful termination of the 2019 Agreement and refusal to fill Plaintiff's 2021 purchase orders. Plaintiff also presented evidence that Cinnerate is a unique product that Plaintiff cannot obtain from another manufacturer. Supp. Birerma Decl. ¶ 4. If unable to fill its customers' orders, there is a credible risk that Plaintiff will lose the market-share, goodwill, and customers it has established.

Defendant argues that Plaintiff cannot show irreparable harm because it filled Plaintiff's purchase orders after this Court's entry of the TRO. However, the record suggests Defendant has yet to fill all of Plaintiff's 2021 purchase orders. Additionally, since Plaintiff has demonstrated a likelihood of success on the merits that the 2019 Agreement was wrongfully terminated, Plaintiff

is entitled to the benefit of its bargain and may place future purchase orders for the life of the Preliminary Injunction.

## III. Balance of Equities

Under the "balance of equities" analysis, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (internal quotation marks and citation omitted). In this case, the balance of equities tips in favor of Plaintiff. Without its product from Defendant, Plaintiff testified that it will be unable to operate a significant portion of its business and risks going under. Defendant on the other hand, retains customers. Additionally, as stated in the TRO, the injunction will require Defendant to honor its existing obligations to Plaintiff under the 2019 Agreement and will not impact its contracts with other customers.

## IV. Public Interest

The public interest does not weigh heavily in this case. At its core, this case is a contract dispute between two private companies. As stated in the TRO, to the extent that it is relevant, the public interest slightly tips in favor of Plaintiff by fostering reliance on the enforcement of contractual rights and obligations.

## V. Bond

Rule 65 provides that a court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ P. 65(c). In this case, the Court finds that a bond of $50,000.00 is sufficient and Plaintiff must provide security in that amount.

//

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunction is GRANTED. Defendant is RESTRAINED and ENJOINED from terminating the Agreement between the parties. Defendant is further ORDERED to immediately fill Plaintiff's pending purchase orders, as well as any future purchase orders consistent with the terms of the Agreement and the parties' past course of dealing. The Court declines to enjoin Defendant from selling Seican to Plaintiff's competitors. This Preliminary Injunction shall remain in effect until the entry of a final judgment in this case.

The Court DIRECTS Plaintiff to place $50,000.00 with the Clerk of Court for deposit in the Treasury Registry Fund per Local Rule 67-1(b) no later than 4:30 p.m. on May 5, 2021 to serve as security for this preliminary injunction. In the alternative, Plaintiff may obtain a non-cash bond certificate in the amount of $50,000.00 and file it with the Clerk of Court no later than 4:30 p.m. on May 5, 2021.

IT IS SO ORDERED.

DATED: May 5, 2021.

*Marco Hernandez*
MARCO A. HERNÁNDEZ
United States District Judge